**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 26-00262-01-CR-W-SRB |
| | ) | |
| JORDAN ANDREW DERRICK, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**
**FOR OUTRAGEOUS GOVERNMENT CONDUCT**
**AND SUGGESTIONS IN SUPPORT**

(Evidentiary Hearing Requested)

**TABLE OF CONTENTS**


I. INTRODUCTION

II. PROCEDURAL AND FACTUAL BACKGROUND

III. LEGAL STANDARD

IV. ARGUMENT

A. The Government Has Created Criminal Liability by Applying Each Charged Statute Beyond Its Text

1. Count One: Voluntary Donations Do Not Make a Person "Engaged in the Business" of Manufacturing Explosive Materials

2. Count Two: Section 842(p)(2)(B) Requires Knowledge of a Specific Recipient's Violent Intent, and Any Such Knowledge Appears to Have Been Supplied by the Government

3. Counts Three and Four: The Government Disregards the Statutory Exclusion for Items Not Designed as Weapons

B. The Government Inflated the Charges With Materials That Were Never Present and Substances That Are Not Explosive

C. The Investigative Measures Were Disproportionate to Any Legitimate Need

D. Misstatements at the Detention Hearing Secured Mr. Derrick's Detention and Impaired His Defense

E. Interference With Mr. Derrick's Ability to Fund His Defense

F. The Totality of the Government's Conduct Violates Due Process

G. Alternatively, the Court Should Hold an Evidentiary Hearing and Order Disclosure

V. CONCLUSION

## TABLE OF AUTHORITIES

**Cases**

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)

*Giglio v. United States*, 405 U.S. 150 (1972)

*Hampton v. United States*, 425 U.S. 484 (1976)

*Luis v. United States*, 578 U.S. 5 (2016)

*Napue v. Illinois*, 360 U.S. 264 (1959)

*United States v. Arthur*, No. 24-4306 (4th Cir. Dec. 3, 2025)

*United States v. Bass*, 404 U.S. 336 (1971)

*United States v. Black*, 733 F.3d 294 (9th Cir. 2013)

*United States v. Hammond*, 371 F.3d 776 (11th Cir. 2004)

*United States v. Henderson-Durand*, 985 F.2d 970 (8th Cir. 1993)

*United States v. Johnson*, 152 F.3d 618 (7th Cir. 1998)

*United States v. King*, 351 F.3d 859 (8th Cir. 2003)

*United States v. Musslyn*, 865 F.2d 945 (8th Cir. 1989)

*United States v. Pardue*, 983 F.2d 843 (8th Cir. 1993)

*United States v. Posnjak*, 457 F.2d 1110 (2d Cir. 1972)

*United States v. Ragusa*, 664 F.2d 696 (8th Cir. 1981)

*United States v. Russell*, 411 U.S. 423 (1973)

*United States v. Stein*, 541 F.3d 130 (2d Cir. 2008)

*United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978)

**Constitutional Provisions**

U.S. Const. amend. V1

U.S. Const. amend. VI1

**Statutes and Regulations**

18 U.S.C. § 841(c)

18 U.S.C. § 841(d)

18 U.S.C. § 841(h)

18 U.S.C. § 841(o)

18 U.S.C. § 841(p)

18 U.S.C. § 842(a)(1)

18 U.S.C. § 842(l)

18 U.S.C. § 842(p)(2)(A)

18 U.S.C. § 842(p)(2)(B)

18 U.S.C. § 3145(b)

26 U.S.C. § 5845

26 U.S.C. § 5861(d)

27 C.F.R. § 555.11

**Rules**

Fed. R. Crim. P. 12(b)

**Other Authorities**

ATF, *Explosives Questions and Answers: Licenses and Permits*, https://www.atf.gov/resource-center/questions-and-answers

Commerce in Explosives; 2026 Annual List of Explosive Materials, 91 Fed. Reg. 37,142 (June 22, 2026)

**DEFENDANT'S MOTION TO DISMISS THE INDICTMENT FOR OUTRAGEOUS GOVERNMENT CONDUCT AND SUGGESTIONS IN SUPPORT**

Defendant Jordan Andrew Derrick, by and through undersigned counsel, and pursuant to Federal Rule of Criminal Procedure 12(b)(1) and 12(b)(3)(A) and the Due Process Clause of the Fifth Amendment to the United States Constitution, respectfully moves the Court to dismiss the Indictment in its entirety. In the alternative, Mr. Derrick requests an evidentiary hearing and an order directing the government to produce the materials identified in Part IV.G below. In support of this motion, Mr. Derrick states as follows.

## I. INTRODUCTION

This prosecution rests on a series of statutory readings that stretch federal explosives and firearms laws well past their text, applied to a man whose alleged conduct consisted largely of publishing research videos online. Viewed in isolation, some of the government's choices might be defended as aggressive charging. Viewed together—the application of a licensing statute to voluntary viewer donations; a speech-based count whose required knowledge element appears to depend on the government's own undercover contacts; destructive-device counts that disregard the statutory exclusion for items not designed as weapons; the inclusion of materials that were never present; an extraordinary deployment of investigative resources; and misstatements that secured Mr. Derrick's pretrial detention—they describe a government that has generated criminal liability rather than discovered it. Due process does not permit that.

Mr. Derrick recognizes that the standard for this relief is demanding and that the defense is reserved for rare cases. He submits that the totality of the circumstances here warrants, at a minimum, an evidentiary hearing. For purposes of this motion only, Mr. Derrick accepts the

Indictment's factual allegations as true, as he must. Nothing in this motion concedes any allegation or waives any defense.

## II. PROCEDURAL AND FACTUAL BACKGROUND

1. On or about July 19, 2025, the Federal Bureau of Investigation's Kansas City Field Office opened an investigation concerning Mr. Derrick. The affidavit later filed in support of the criminal complaint (the "Complaint Affidavit") invokes the January 1, 2025 attack in New Orleans, Louisiana, and asserts that the perpetrator of that attack downloaded Mr. Derrick's publicly available videos. The government has not alleged that Mr. Derrick had any contact with, knowledge of, or connection to that attack or to any person involved in it.

2. The government's case rests substantially on videos that Mr. Derrick published openly online, under his own identity, between approximately September 18, 2023 and May 12, 2026, documenting research and experimentation involving energetic materials.

3. Over the course of its investigation, the government: (a) installed a camera on a utility pole to monitor Mr. Derrick's family residence for months; (b) flew a drone equipped with a thermal camera over the residence; (c) had personnel photograph and film the rural property from passing vehicles; (d) obtained approximately twenty years of Mr. Derrick's bank, email, telephone, location, and tax records; (e) opened fraud inquiries into Mr. Derrick's father and wife; and (f) deployed undercover operatives to engage with Mr. Derrick.

4. On May 8, 2026, the government filed a criminal complaint against Mr. Derrick. Among other charges, the complaint alleged unlawful possession of an unregistered destructive device consisting of nickel aminoguanidine perchlorate ("NAP"), on or about September 18, 2023. That charge does not appear in the operative Indictment.

5. On May 12, 2026, agents, including members of the FBI Hostage Rescue Team supported by an armored vehicle, arrested Mr. Derrick at his home and searched the property.

6. On May 28, 2026, the grand jury returned the operative four-count Indictment, charging: Count One, engaging in the business of manufacturing explosive materials without a license, 18 U.S.C. § 842(a)(1); Count Two, distribution of information relating to explosives, 18 U.S.C. § 842(p)(2)(B); Count Three, possession of an unregistered firearm (destructive device), alleged to consist of thermite and thermate compositions, 26 U.S.C. §§ 5845(a)(8), 5845(f), and 5861(d); and Count Four, possession of an unregistered firearm (destructive device), alleged to consist of "components to readily assemble improvised explosive devices," 26 U.S.C. §§ 5845(a)(8), 5845(f), and 5861(d).

7. Count One lists, among the materials Mr. Derrick allegedly manufactured, ethylene glycol dinitrate ("EGDN"), hexamethylene triperoxide diamine ("HMTD"), trinitroxylene ("TNX"), and aminoguanidine bicarbonate.

8. Count Four alleges, "to wit," a list of loose materials and parts, including mercury switches, electric matches, improvised detonator components, pyrotechnic remote firing devices, ball bearings, urea nitrate, RDX, PETN, NAP, and hollowed-out grenade bodies. The Indictment does not allege that any of these items was assembled into a device.

9. At the detention hearing, FBI Special Agent Kacie Laidacker testified that Mr. Derrick's family exited the residence ahead of him during the May 12 operation. Mr. Derrick contends, and anticipates that the recordings and reports of the operation will show, that he exited first, informed agents that his wife and children remained inside, and complied fully. Counsel for the government also characterized Mr. Derrick as a "bigot," referred to "hate speech" and "concerning social media posts," and described his lawfully owned and registered

firearms and ammunition as indicative of dangerousness. The Court ordered Mr. Derrick detained. He remains detained at the Pettis County Jail.

10. Following his arrest, financial institutions closed accounts held by Mr. Derrick and his wife, and his wife has been unable to open new accounts. The closures have impaired the family's ability to fund Mr. Derrick's defense.

## III. LEGAL STANDARD

The Supreme Court has recognized that there may be cases in which "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32 (1973); *see also Hampton v. United States*, 425 U.S. 484, 495 (1976) (Powell, J., concurring in the judgment). The inquiry asks whether the government's conduct violates "that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *Russell*, 411 U.S. at 432.

In this Circuit, "[t]he level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court." *United States v. King*, 351 F.3d 859, 867 (8th Cir. 2003) (quoting *United States v. Pardue*, 983 F.2d 843, 847 (8th Cir. 1993)). The defense applies to conduct within "that narrow band of 'the most intolerable government conduct.'" *Id.* (quoting *United States v. Musslyn*, 865 F.2d 945, 947 (8th Cir. 1989)). Because the claim asserts a defect in the institution of the prosecution, it is decided by the Court and must be raised before trial. *See United States v. Henderson-Durand*, 985 F.2d 970, 973 & n.5 (8th Cir. 1993); Fed. R. Crim. P. 12(b)(3)(A).

Courts assess such claims on the totality of the circumstances, and every case turns on its own facts. The Ninth Circuit has identified factors that guide the analysis, including: (1) the

known criminal characteristics of the defendant; (2) individualized suspicion of the defendant; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendant to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and the necessity for the actions taken in light of that crime. *United States v. Black*, 733 F.3d 294, 303 (9th Cir. 2013). Among the conduct that courts have recognized as outrageous is the generation of new crimes merely for the sake of pressing criminal charges. *Id.* at 302; *see also United States v. Twigg*, 588 F.2d 373, 380–81 (3d Cir. 1978) (reversing convictions where the government's involvement created the offense).

## IV. ARGUMENT

### A. The Government Has Created Criminal Liability by Applying Each Charged Statute Beyond Its Text.

A recurring feature of this Indictment is that each count depends on a reading of the charging statute that its text does not support. When the government repeatedly selects readings that convert non-criminal conduct into felonies, the resulting prosecution is not the discovery of crime but its manufacture. Criminal statutes are to be construed narrowly, and ambiguity is resolved in the defendant's favor. *United States v. Bass*, 404 U.S. 336, 347–48 (1971).

#### *1. Count One: Voluntary Donations Do Not Make a Person "Engaged in the Business" of Manufacturing Explosive Materials.*

Section 842(a)(1) does not criminalize manufacturing explosive materials; it criminalizes "engag[ing] in the business of" manufacturing them without a license. 18 U.S.C. § 842(a)(1). The statute and its implementing regulations define a "manufacturer" as a person "engaged in the business of manufacturing explosive materials." 18 U.S.C. § 841(h); 27 C.F.R. § 555.11. "Explosive materials," in turn, means "explosives, blasting agents, and detonators," 18 U.S.C. §

841(c), and "explosives" means "any chemical compound mixture, or device, the primary or common purpose of which is to function by explosion," as identified on the list the Attorney General must "publish and revise at least annually in the Federal Register." *Id.* § 841(d). The offense thus has two textual limits: the person must be engaged in the *business* of manufacturing, and what is manufactured must be an *explosive material* within the meaning of § 841(c) and (d). Consistent with that text, the Bureau of Alcohol, Tobacco, Firearms and Explosives has long advised the public that "[p]ersons who manufacture explosives for their personal, non-business use are not required to have a manufacturer's license." ATF, *Explosives Questions and Answers: Licenses and Permits*, https://www.atf.gov/resource-center/questions-and-answers (last visited Oct. 8, 2026).

The government's theory is that Mr. Derrick was "in the business" because viewers of his publicly available videos made voluntary donations. The Indictment does not allege that Mr. Derrick sold, distributed, or delivered explosive materials to anyone. A donation made by a viewer in support of published content is a payment connected to speech, not a sale of explosive materials. The government's reading has no limiting principle: under it, re-editing and re-posting the same footage, or receiving a new donation for an old video, would each constitute a fresh act of unlicensed manufacturing, even though no additional material was ever made. A statute directed at unlicensed commerce in explosives cannot be stretched to reach a person whose only "commerce" was the receipt of voluntary support for published expression.

***2. Count Two: Section 842(p)(2)(B) Requires Knowledge of a Specific Recipient's Violent Intent, and Any Such Knowledge Appears to Have Been Supplied by the Government.***

Section 842(p)(2)(B) does not prohibit publishing information about explosives. It prohibits teaching, demonstrating, or distributing such information to a person while "knowing

that such person intends to use" it "for, or in furtherance of, an activity that constitutes a Federal crime of violence." 18 U.S.C. § 842(p)(2)(B). The only court of appeals to squarely address the provision's constitutionality upheld it precisely because that knowledge requirement confines its reach. The court held that the statute requires the speaker's knowledge "to exist at the time of the proscribed teaching or distribution," and explained that "the conduct proscribed by § 842(p)(2)(B) must be directed toward some specified person(s)," whereas "[s]ection 842(p)(2)(A) contains no such limiter." *United States v. Arthur*, No. 24-4306, slip op. at 27 & n.12 (4th Cir. Dec. 3, 2025) (published). Absent that knowledge, dissemination of technical information to the public remains protected expression. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam).

Publishing videos to a general online audience does not satisfy the statute's knowledge element. To the extent the government intends to prove that element through communications with its own undercover operatives—persons who, at the government's direction, presented themselves as intending to commit violence—the government will have supplied the single fact that transforms protected publication into a federal felony. That is the paradigm of the government "generating new crimes merely for the sake of pressing criminal charges." *Black*, 733 F.3d at 302. It weighs heavily under the third, fourth, and fifth *Black* factors.

***3. Counts Three and Four: The Government Disregards the Statutory Exclusion for Items Not Designed as Weapons.***

The National Firearms Act defines "destructive device" to include certain explosive or incendiary bombs, grenades, and similar devices, and "any combination of parts either designed or intended for use in converting any device into a destructive device . . . and from which a destructive device may be readily assembled." 26 U.S.C. § 5845(f)(1), (3). The same subsection

expressly provides that the term "shall not include any device which is neither designed nor redesigned for use as a weapon." *Id.* § 5845(f).

Courts have long refused to treat explosive materials themselves as destructive devices absent proof of design for use as a weapon. *See United States v. Posnjak*, 457 F.2d 1110, 1116–19 (2d Cir. 1972) (commercial dynamite, caps, and fuse not a destructive device). As the Eleventh Circuit has put it, statutory coverage "depends upon proof that a device is an explosive plus proof that it was designed as a weapon," and the question is "whether the device, as designed, has any value other than as a weapon." *United States v. Hammond*, 371 F.3d 776, 780–82 (11th Cir. 2004) (affirming judgment of acquittal). Where the government proceeds on a combination-of-parts theory under § 5845(f)(3), the Eighth Circuit asks whether the parts "formed a new entity with destructive capabilities of its own and without a legitimate purpose." *United States v. Ragusa*, 664 F.2d 696, 699–700 (8th Cir. 1981). And where items have both legitimate and destructive uses, the inquiry turns on objective design and, if design is not dispositive, on intended use; a design consistent with a legitimate purpose falls outside the statute. *See United States v. Johnson*, 152 F.3d 618, 625–28 (7th Cir. 1998).

Count Three treats thermite and thermate compositions used in recorded, published demonstrations as "destructive devices." Incendiary compositions used for demonstration are not bombs or grenades, and the government identifies nothing designed or redesigned for use as a weapon. Nor are they "explosives" in the statutory sense: thermite and thermate are incendiary compositions whose purpose is to burn, not "to function by explosion," 18 U.S.C. § 841(d), and neither appears on the list of explosive materials the Attorney General publishes under that subsection. *See* Commerce in Explosives; 2026 Annual List of Explosive Materials, 91 Fed. Reg. 37,142 (June 22, 2026).

Count Four is more striking still. By its "to wit" clause, it aggregates a list of loose materials and parts—drawn, by the government's own account, from a residence, garage, and workspace containing thousands of items—and declares them collectively to be a "firearm." The Indictment does not allege an assembled device. Each listed category has recognized non-weapon uses, which Mr. Derrick will establish at a hearing. Taken to its logical end, the government's theory would make every hardware store and chemical supplier a possessor of unregistered destructive devices. Having used "to wit" language, the government is bound to the items it listed, and those items must themselves satisfy the statute. *See Johnson*, 152 F.3d at 629–30 (government must prove a device substantially matching the indictment's description).

Mr. Derrick recognizes that whether a particular item is a destructive device may ultimately present questions for trial. He raises these points here because the government's consistent choice of the broadest possible reading, count after count, is itself evidence that the prosecution was constructed rather than discovered.

**B. The Government Inflated the Charges With Materials That Were Never Present and Substances That Are Not Explosives.**

The government's charging decisions reflect a pattern of inflating the apparent severity of the case. First, the criminal complaint alleged a destructive device consisting of NAP—a charge the government later abandoned. Second, Count One lists EGDN, HMTD, and TNX among the materials Mr. Derrick allegedly manufactured. None of these substances was recovered, and no laboratory report identifies them. Their inclusion appears calculated to associate Mr. Derrick with sensitive materials that draw heightened concern from law enforcement and the public. Third, Count One lists aminoguanidine bicarbonate as an explosive material, although it is a compound sold openly to the public, is not a compound "the primary or common purpose of which is to function by explosion," and does not appear on the list of explosive materials

published under 18 U.S.C. § 841(d). *See* 91 Fed. Reg. 37,142. Alleging that a defendant made substances that do not exist in the case is not charging a crime; it is inventing one.

Congress's own definitional scheme underscores the point with respect to EGDN. Section 841(p) designates ethylene glycol dinitrate as a "detection agent"—one of a short list of substances that must be "introduced into a plastic explosive or formulated in such explosive as a part of the manufacturing process" so that the explosive can be detected, at a minimum concentration of 0.2 percent by mass, in implementation of the Convention on the Marking of Plastic Explosives for the Purpose of Detection. 18 U.S.C. § 841(o), (p)(1); *see also id.* § 842(l) (prohibiting the manufacture of plastic explosives that do not contain a detection agent). The point is not that EGDN is benign. It is that the Indictment invokes, by name and without any recovered material or laboratory result, a substance that Congress has specifically identified as a marker for the detection of explosives, and places it alongside HMTD and TNX—likewise never recovered—in a count whose gravamen is supposed to be the unlicensed *business* of manufacturing. A charging instrument that names substances for their resonance rather than their presence in the case is inflating the charge, not describing it.

**C. The Investigative Measures Were Disproportionate to Any Legitimate Need.**

Mr. Derrick does not contend that any single investigative step is, by itself, a due process violation. But the sixth *Black* factor asks about "the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise." 733 F.3d at 303. Here, the government investigated a man whose alleged conduct was published openly under his own identity. In response, it maintained months of camera surveillance of his family home, flew a thermal-imaging drone over it, collected two decades of his financial and communications records, opened inquiries into his father and wife, deployed undercover operatives, and executed

the arrest with a Hostage Rescue Team and an armored vehicle. Mr. Derrick has no history of violence or of resistance to law enforcement. The scale of these measures, set against the conduct actually charged, bears directly on whether the government was investigating a crime or building one.

**D. Misstatements at the Detention Hearing Secured Mr. Derrick's Detention and Impaired His Defense.**

The government may not knowingly present false testimony or allow it to go uncorrected. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Giglio v. United States*, 405 U.S. 150, 153 (1972). At the detention hearing, Special Agent Laidacker testified that Mr. Derrick's family exited the residence before him—testimony that suggested he sheltered behind his wife and children or delayed in order to resist. The evidence will show the opposite: Mr. Derrick exited first, told agents that his family remained inside, and complied. The government, which had access to the operation's recordings and reports, did not correct the testimony.

Government counsel further described Mr. Derrick as a "bigot," referred to "hate speech" and "concerning social media posts," and characterized his lawfully owned and registered firearms and ammunition as evidence of dangerousness. Protected speech and the lawful exercise of Second Amendment rights are not evidence of criminality. The resulting detention has substantially limited Mr. Derrick's ability to review voluminous discovery and assist in his defense. Mr. Derrick reserves his right to seek review of the detention order under 18 U.S.C. § 3145(b); he raises the hearing here because it forms part of the totality of the government's conduct.

**E. Interference With Mr. Derrick's Ability to Fund His Defense.**

The Sixth Amendment protects a defendant's right to use his untainted resources to retain counsel of his choice. *Luis v. United States*, 578 U.S. 5, 10–13 (2016) (plurality opinion).

Government action that deliberately impairs a defendant's access to defense funding can warrant dismissal. *See United States v. Stein*, 541 F.3d 130, 136, 156–57 (2d Cir. 2008). Following Mr. Derrick's arrest and the government's public characterization of him, financial institutions closed the accounts he held with his wife, and she has been unable to open new accounts. The closures have created severe hardship during his detention and have impaired the family's ability to fund his defense. Mr. Derrick is entitled to learn whether, and to what extent, government contact with those institutions contributed to the closures, and he requests that disclosure in Part IV.G below.

**F.The Totality of the Government's Conduct Violates Due Process.**

No single factor controls. But the combination here is extraordinary: statutory readings that convert publication and voluntary donations into felonies; a speech-based count whose critical element appears to have been furnished by the government's own operatives; destructive-device counts that ignore the statute's express exclusion; charges built on materials that were never present; investigative measures out of all proportion to the conduct; and uncorrected misstatements that secured detention. Together, these circumstances show a prosecution the government constructed for the purpose of bringing charges. That conduct is shocking to the universal sense of justice, and the Indictment should be dismissed.

**G. Alternatively, the Court Should Hold an Evidentiary Hearing and Order Disclosure.**

Because the outrageous-conduct inquiry is fact-intensive, Mr. Derrick requests, at a minimum, an evidentiary hearing. To permit a full presentation, he further requests that the Court order the government to produce, in advance of the hearing, to the extent not already produced in discovery:

1. All communications between Mr. Derrick and any undercover agent or confidential human source, together with the instructions given to those persons;
2. All reports and recordings concerning the May 12, 2026 arrest and search, including body-worn and vehicle camera footage;

3. The complete seizure inventory and all laboratory reports;
4. Records reflecting any government contact with financial institutions concerning Mr. Derrick or his wife; and
5. Documents reflecting the predicate for and origin of the investigation.

## V. CONCLUSION

WHEREFORE, Defendant Jordan Andrew Derrick respectfully requests that the Court dismiss the Indictment with prejudice; or, in the alternative, that the Court order the disclosures described in Part IV.G, set this matter for an evidentiary hearing, and grant such further relief as the Court deems just and proper.

Respectfully submitted,

**COMBS WATERKOTTE**

/s/ Matthew Brown
Matthew Brown, Mo. Bar No. 63457
231 S. Bemiston Avenue, Suite 1100
St. Louis, Missouri 63105
Telephone: (314) 900-4357
Email: mb@combswaterkotte.com
**ATTORNEY FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed electronically with the Clerk of the Court on the date reflected in the CM/ECF system, which will send notification of such filing to all counsel of record, including counsel for the United States.

/s/ Matthew Brown
Matthew Brown